U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

2019 FEB -6  AM 9: 34

CLERK

BY_____

DEPUTY CLERK

**UNITED STATES OF AMERICA**

**Plaintiff,**

vs.

**GREENWAY HEALTH, LLC**

**Defendant.**

Case No. _____

**COMPLAINT**

2:19-cv-20

JOSEPH H. HUNT
Assistant Attorney General

MICHAEL D. GRANSTON
EDWARD C. CROOKE
KELLEY HAUSER
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
(617) 748-3308
edward.crooke@usdoj.gov
kelley.hauser@usdoj.gov

CHRISTINA E. NOLAN
United States Attorney

NIKOLAS P. KEREST
OWEN C.J. FOSTER
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
nikolas.kerest@usdoj.gov
owen.c.j.foster@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

**UNITED STATES OF AMERICA**

               **Plaintiff,**

    **vs.**

**GREENWAY HEALTH, LLC**

               **Defendant.**

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

1.      The United States of America ("United States") files this complaint for the limited purpose of settlement to recover damages arising from false statements made and caused by Defendant Greenway Health, LLC ("Greenway") and arising from false claims that Greenway caused to be submitted to the Department of Health and Human Services ("HHS") and state Medicaid agencies for federal incentive payments through the Electronic Health Record ("EHR") Incentive Program.

2.      Pursuant to the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), HHS established an EHR certification program and the Medicare and Medicaid EHR Incentive Programs (also known as the "Meaningful Use program"), which provided incentive payments to healthcare providers ("users" or "customers") who attested to using, and demonstrated "meaningful use" of, certified EHR technology.

3.      Greenway is a health information technology ("HIT") and services developer that developed Prime Suite, an EHR technology marketed and sold to healthcare providers throughout the United States, including in Vermont. Greenway falsely represented to its certifying bodies and its users that Prime Suite complied with the requirements for certification,

and caused its users to falsely attest they were eligible to receive incentive payments under the Meaningful Use program.

4. Since 2011, healthcare providers who used Greenway's Prime Suite software and attested to using certified EHR technology to satisfy the Meaningful Use objectives and measures have received incentive payments through the Meaningful Use program.

5. At the time of its testing to the 2014 Edition certification criteria in January and February 2013—and for many years thereafter—Prime Suite was unable to satisfy all applicable requirements for certification. Instead, Greenway falsely obtained EHR certification for Prime Suite by: (a) affirmatively misrepresenting to its testing and certifying bodies that Prime Suite met all applicable certification criteria and/or failing to disclose that its software did not meet the full scope of the criteria relevant to its certification; and (b) programming its software to satisfy specific certification testing scenarios known as "test scripts"—which Greenway obtained in advance of testing—rather than programming Prime Suite to meet the full scope of the certification criteria. By virtue of that conduct, Greenway caused Prime Suite users to falsely attest to the Centers for Medicare & Medicaid Services ("CMS") and state Medicaid agencies that these users met the requirements for receipt of Meaningful Use incentive payments based on using a certified EHR technology, when in fact Prime Suite did not constitute certified software as it could not support the full scope of the certification criteria for its users in the clinical setting ("in the field").

6. Had Greenway disclosed that its Prime Suite software did not meet the 2014 Edition certification criteria, it would not have been certified and its users would not have been eligible for incentive payments. Unless otherwise specified, the relevant time period covered by

Greenway's failure to meet the 2014 Edition certification as described herein is January 1, 2014 to December 31, 2017.

7.      In addition, Greenway erroneously programmed an earlier version of Prime Suite, which was certified to the 2011 Edition certification criteria, to calculate improperly certain Meaningful Use measures. As a result, Greenway provided users of this earlier version of Prime Suite with inaccurate data regarding Meaningful Use measures, knowing this false information would cause these Prime Suite users to attest falsely to CMS and state Medicaid agencies that they were eligible for Meaningful Use incentive payments. Unless otherwise specified, the relevant time period covered by Greenway's inaccurate calculations of Meaningful Use measures as described herein is January 1, 2011 through March 31, 2014.

8.      Furthermore, Greenway violated the Anti-Kickback Statute through its provision of remuneration to users in exchange for recommending Prime Suite to other prospective users. Unless otherwise specified, the relevant time period covered by Greenway's payment of unlawful kickbacks as described herein is from January 1, 2011 to December 31, 2017.

9.      Greenway's false and fraudulent statements and conduct violate the federal False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.*

**I.      PARTIES**

10.      The United States, acting through CMS, administers the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq,* ("Medicare"), administers grants to states for Medical Assistance Programs ("Medicaid") pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq*, and also administers the Meaningful Use program. The United States, acting through HHS's Office of the National Coordinator for Health Information Technology ("ONC") administers a certification program for EHR technology.

11.     Greenway is a privately held corporation headquartered in Tampa, Florida. Greenway is a health information technology and services provider that, serves more than 100,000 providers and 13,000 medical organizations across the United States.

**A.     Relevant Greenway Employees**

12.     Jared Howerton was employed by Greenway from January 2001 until February 2015. Between January 2011 and December 2013, Howerton was a Product Manager with certain responsibilities for supervising the design of Greenway's Prime Suite software and ensuring its compliance with Meaningful Use incentive payment requirements.

13.     Kevin Kornegay was employed by Greenway from June 2010 until April 2015. Between January 2011 and December 2013, Kornegay was a Business Analyst with certain responsibilities for designing Greenway's Prime Suite software and ensuring its compliance with Meaningful Use incentive payment requirements. During that period of time, Kornegay reported to Howerton.

14.     Venisa Hardin was Greenway's Vice President of Provider Services Research and Development from May 2001 through December 2013, and Vice President of Product Management from January 2014 through June 2014.

15.     Susan Tice was a Business Analyst at Greenway from December 1999 to May 2006, a Research and Development Support Liaison from May 2006 to October 2007, and Greenway's Director of Support from October 2007 to June 2014.

16.     Johnathan Samples was a Software Developer at Greenway from 1998 until 2007, Vice President for Prime Suite from 2007 until 2010, Executive Vice President Research and Development from 2010 until 2014, and Chief Innovation Officer from January 2014 until June 2014.

4

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  This Court has supplemental jurisdiction over the common law cause of action under 28 U.S.C. § 1367(a).

18.     This Court has personal jurisdiction over Greenway and venue is appropriate in this Court under 31 U.S.C. § 3732(a) because Greenway transacts business in this District and caused the submission of false claims from this District.

## III.     STATUTORY AND REGULATORY BACKGROUND

### A.     The False Claims Act

19.     The FCA imposes civil liability on any person who, *inter alia*: (1) knowingly presents, or causes to be presented, to an officer, employee, or agent of the United States a false or fraudulent claim for payment or approval; and (2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.  31 U.S.C. §§ 3729(a)(1)(A) and (B).

20.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest . . . . " *Id.* § 3729(b)(2).

21.     The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. *Id.* § 3729(b)(1)(B).

22.     The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

23.     Any person who violates the FCA is liable for a mandatory civil penalty for each such claim, plus three times the damages sustained by the Government. *Id.* § 3729(a)(1).

### B.     The Anti-Kickback Statute

24.     The federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), provides, in pertinent part:

(2)     Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-

    (A)     To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B)     To purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

25.     Accordingly, EHR developers—such as Greenway—may not offer or pay any remuneration, in cash or in kind, directly or indirectly, to induce physicians or hospitals or others to order or recommend their products if those products are paid for in whole or in part by Federal healthcare programs such as Medicare and Medicaid.

26.     The Patient Protection and Affordable Care Act (PPACA), Publ. L No. 111-148, 124 Stat. 119 (2010), provides that violations of the AKS are *per se* violations of the FCA: "a

6

claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the FCA]."

27.     The PPACA also clarified the intent requirement for the Anti-Kickback Statute, and provides that "a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation."

##### C.     Certified EHR Technology and the Meaningful Use Program

28.     On February 17, 2009, Congress enacted the HITECH Act to promote the adoption and meaningful use of certified EHR technology.  Under the HITECH Act, ONC established a certification program for EHR technology.  As part of the certification program, an EHR developer that seeks to have its software certified must provide documentation and evidence to an ONC-authorized accredited testing laboratories (ONC-ATLs) and certification bodies (ONC-ACBs) that the relevant software meets the full scope of the certification requirements established by ONC.  The ONC-ATLs and ONC-ACBs test and certify that developers' EHRs are compliant with the certification requirements.

29.     Through the Meaningful Use program, CMS makes incentive payments to healthcare providers for demonstrating meaningful use of certified EHR technology.  Individual practitioners ("Eligible Professionals") could qualify for up to a total of $43,720 over five years from Medicare (ending after 2016) and up to a total of $63,750 over six years from Medicaid (ending after 2021).

30.     In order to qualify for incentive payments under the Meaningful Use program, Eligible Professionals were required, among other things, to: (1) use an EHR system that qualified as certified EHR technology; and (2) satisfy certain objectives and measures relating to their meaningful use of the certified EHR technology.

31.     HHS implemented the certification criteria and incentive payment requirements in multiple stages. On January 13, 2010, HHS published in the Federal Register an interim final rule setting forth the "2011 Edition" certification criteria for certified EHR technology, and a proposed rule setting forth the "Stage 1" meaningful use requirements for incentive payments. HHS finalized these rulemakings by publication in the Federal Register on July 28, 2010. As established in that final rule, in Stage 1, an Eligible Professional's use of certified EHR technology generally needed to satisfy fifteen "core objectives" and five out of ten "menu set objectives."

32.     On September 4, 2012, HHS published in the Federal Register the final rules setting forth the "2014 Edition" certification criteria for certified EHR technology, and "Stage 2" meaningful use requirements for incentive payments. As established in that final rule, in Stage 2, an Eligible Professional's use of certified EHR technology generally needed to satisfy seventeen "core objectives" and three out of six "menu set objectives."

33.     On October 16, 2015, CMS published in the Federal Register a final rule with comment period setting forth the "Modified Stage 2" meaningful use requirements for incentive payments. For years 2015 through 2017, Modified Stage 2 eliminated the concept of "menu set objectives" and required all Eligible Professionals to attest to a single set of objectives and measures.

34.     To obtain certification, EHR developers must represent to an ONC-ACB that their EHR product satisfies the full scope of the certification criteria for which they have applied and submit to and pass certification testing by an ONC-ATL.

35.     Testing and certification are based on the scope of the specific regulatory criteria that the developer represents its software satisfies and on which the developer requests to be

tested and certified.  Specifically, the ONC-ATL relies on representations from the developer regarding the capabilities of its software and uses only the ONC-approved test methods that relate to the regulatory criteria for which the developer has requested testing and certification. The ONC-ACB likewise relies on representations from the developer regarding the capabilities of its software and bases certification decisions on those representations and the testing performed by the ONC-ATL.

36.     After obtaining certification, an EHR developer must maintain that certification by complying with all applicable conditions and requirements of the certification program. Among other things, the EHR product must be able to accurately, reliably, and safely perform its certified capabilities in the field.  EHR developers must also cooperate with the processes established by ONC for conducting ongoing surveillance and review of certified EHR technology.

37.     To qualify for incentive payments in each Stage of the Meaningful Use program, healthcare providers were required to attest each year that they used certified EHR technology and satisfied the applicable Meaningful Use objectives and measures.  Use of certified EHR technology and satisfaction of applicable Meaningful Use objectives and measures are material to payment under the Meaningful Use program.

38.     CMS payment rules concerning the Meaningful Use program recognize that healthcare providers rely on certification for assurance that an EHR product meets the applicable certification criteria, including that it possesses the certified capabilities that healthcare providers will need to use to achieve relevant objectives and measures, and that the software will perform in accordance with applicable certified capabilities.

39.     ONC-ACBs "have a responsibility to ensure that the certifications they issue

serve as an indication of [an EHR's] capabilities and compliance with the certification criteria adopted" by HHS and are expected to "conduct surveillance" that focuses on whether certified EHRs "continue to perform 'in the field' or in a 'live' environment as they did when they were certified." 76 FR 1282 (January 7, 2011).

40.     HHS, in establishing the final rules for certification of health information technology, noted that "[s]urveillance should provide additional assurances to the HIT market that [EHRs] will continue to perform in an operational setting or 'live' environment as they did when they were certified." *Id.* at 1308.

## IV.     GREENWAY'S FALSE STATEMENTS AND FRAUDULENT CONDUCT IN CONNECTION WITH ITS 2014 EDITION CERTIFICATION

41.     Since the start of the Meaningful Use program, in order to qualify for incentive payments, healthcare providers have been required to use certified EHR technology. An EHR product cannot be certified unless all applicable certification criteria and standards have been met. Certification is material to payment under the Meaningful Use program.

42.     As noted in the Federal Register, "[t]here are multiple benefits that stem from the 2014 Edition EHR certification criteria. Foremost, the 2014 Edition EHR certification criteria promote enhanced interoperability, functionality, utility, and security of EHR technology through capabilities they include and the standards they require EHR technology to meet for certification." 45 FR 54282 (Sept. 4, 2012).

43.     Eligibility for Meaningful Use Stage 2 incentive payments required healthcare providers to use 2014 Edition certified EHR technology that, *inter alia*, utilized standardized clinical terminology known as Systematized Nomenclature of Medicine – Clinical Terms ("SNOMED CT") in connection with software functions that enabled users to electronically record, change, and access a patient's problem list. In particular, the 2014 Edition certification

10

regulations required incorporation of SNOMED CT International Release, July 2012; and US Extension to SNOMED CT, March 2012.  45 C.F.R. § 170.207(a)(3).

44.     The use of SNOMED CT codes enables providers and EHRs to communicate in a common language, which improves the quality of patient care across different providers and care episodes.  SNOMED CT was adopted, in part, because it was determined by HHS to be "the best vocabulary to use in those certification criteria that focus on electronic health information exchange."  77 FR 54210 (Sept. 4, 2012).

45.     Eligibility for Meaningful Use Stage 2 incentive payments also required healthcare providers to use 2014 Edition certified EHR technology to, among other things, generate and transmit prescriptions electronically (commonly referred to as ePrescriptions) using a standardized drug vocabulary known as RxNorm, which specifies each unique drug, formulation, and dosage.  45 C.F.R. 170.314(b)(3).  RxNorm codes provide a mechanism for ensuring the accuracy of ePrescriptions and for allowing EHR systems to communicate and interact accurately and efficiently with other EHR systems, with pharmacies, and with health information networks.

46.     Greenway did not adopt, implement, or fully utilize the RxNorm and SNOMED CT standards as required for certification as a complete EHR at the time of Prime Suite's testing. Likewise, Prime Suite did not fully utilize these standards in the product Greenway put into production for use in the field.  Greenway thereby caused Prime Suite to be tested, certified, and put into production when it did not fully comply with the regulatory criteria and standards.

47.     Thus, and as described in further detail below, Greenway obtained its Prime Suite certification through fraudulent means.

A.   **GREENWAY'S PLAN TO SHORTCUT CERTAIN FUNCTIONALITY TO PASS CERTIFICATION TESTING AND BECOME ONE OF THE FIRST DEVELOPERS CERTIFIED TO THE 2014 EDITION**

48.   Greenway was one of the later EHR software developers to achieve 2011 Edition certification—obtaining certification of its Prime Suite product on October 14, 2010. Greenway felt that its delay in obtaining certification put it at a competitive disadvantage as compared with other developers in the EHR market. On October 21, 2010, Howerton lamented that "priority wasn't made" to be the first to certify and that the "[b]ottom line is that we should have made it a priority to be the first certified." Greenway was therefore determined to ensure that it was one of the first developers certified to the 2014 Edition.

49.   Beginning as early as 2012, Kornegay and Howerton were tasked with responsibility for securing certification to the 2014 Edition for Prime Suite and were both pressured and incentivized by their superiors, including Samples, to ensure that Prime Suite was one of the first EHR products certified to the 2014 Edition.

50.   In order to ensure early certification, Greenway began planning to "shortcut[] some functionality" as early as Fall 2012. On October 29, 2012, a Greenway developer emailed Kornegay and a team of software developers about a "MU2 Kickoff Call." The agenda included the following:

- o   **MU2 Inital Cert, target deliverable 12/1**
- o   **Shortcutting some functionality**

51.   Thus, Greenway planned to obtain what it referred to internally as "initial" certification by "shortcutting some functionality."

52.   On November 29, 2012, Howerton sent an email to his superior, Hardin, carbon copying Kornegay, confirming that Greenway was "definitely going to attempt some hacks in order to be the first certified vendor."

53.     Howerton additionally noted that ACBs were "specifically going to be looking for hacks and failing criteria for vendors who do it" and queried whether "this changes Johnathan's option [sic] regarding our analysis/development/testing timeline efforts to be the first certified vendors vs getting a real solution built and tested?"  Based on information and belief, "Johnathan" in this context refers to Johnathan Samples.

54.     With certification testing scheduled to begin in January 2013, Kornegay was offered a bonus contingent on Greenway obtaining certification in the first round of developers.  On December 6, 2012, Kornegay told Howerton that "J gave me a deadline and a bonus this morning."  Kornegay admitted he was "not sure it can be done, but my fingers will be worn down to the nubs either way.  It's a big f*cking carrot."  Again, based on information and belief, "J" in this context refers to Johnathan Samples.

55.     On January 6, 2013, Hardin emailed Kornegay and Howerton regarding a meeting to "discuss the post certification plan and the biggest thing needed for that to be meaningful is an idea of the size and scope of the gaps between what we have and what we need.  This is obviously secondary to what you're doing for certification but I wanted to see if you have a general idea . . . ."

56.     Howerton emailed Hardin and Samples on January 14, 2013, stating, "the intent of this functionality was only being developed for MU2 initial certification" and that Greenway's "initial goal was to throw things as fast as possible together for certification . . . ."

57.     Greenway thus initially prepared Prime Suite only to pass testing, and not to actually fully comply with the functionalities needed to satisfy the regulatory criteria required for certification.  Greenway supervisors and managers—including Samples, Hardin, and Howerton—were specifically aware of and orchestrated Greenway's plan to cheat certification

testing. Greenway did not rectify all of the "gaps" between what it provided for certification testing and what was required for doctors to have a fully functional EHR that satisfied the requirements for payment.

## B. GREENWAY FAILED TO SATISFY THE CERTIFICATION CRITERIA AND MADE FALSE STATEMENTS IN OBTAINING CERTIFICATION AND MARKETING PRIME SUITE

58.     The Certification Commission for Health Information Technology (CCHIT) was a private company approved by ONC as an ONC-ATL and ONC-ACB to test and certify EHR products that met certification requirements. Greenway retained CCHIT and paid CCHIT for its services in connection with the testing and certification of Prime Suite to the 2014 Edition of the certification criteria.

59.     CCHIT utilized standardized testing protocols, or test scripts, which identified each step taken during testing. Test scripts were routinely provided to EHR developers in advance of their test date, and here CCHIT provided the test scripts to Greenway in advance of Prime Suite's testing. Among other things, the test scripts informed the EHR developers of precisely which drugs and corresponding RxNorm drug codes would need to be ordered to pass testing and, similarly, what diagnoses and corresponding SNOMED-CT codes would need to be demonstrated.

60.     Notably, certification testing does not confirm that each criteria and standard is satisfied in full and under every conceivable scenario. Rather, testing takes a snapshot of a product's capabilities by ensuring it can pass certain test cases for which developers are provided the test scripts in advance.

61.     In January 2013, Greenway submitted an application to CCHIT for testing and certification of Prime Suite to the 2014 Edition. As part of the application, Greenway

14

represented that Prime Suite satisfied the certification criteria for a complete EHR and was capable of meeting those criteria and using the required standards in the field. This representation was false. At the time that Greenway submitted Prime Suite for certification testing, its employees knew that it did not adequately perform numerous capabilities required by the certification criteria.

62.     Howerton and Kornegay were responsible for preparing and submitting Prime Suite's attestation documents to its ACB and for understanding the regulations and ensuring Greenway's compliance therewith.

63.     Greenway represented to CCHIT, its ONC-ATL and ONC-ACB, that Prime Suite satisfied the ePrescribing requirements, including implementation of the RxNorm vocabulary. 45 C.F.R. §170.314(b)(3). However, at that time and for years afterwards, Greenway had not implemented the RxNorm vocabulary into Prime Suite's electronic prescription functions.

64.     The testing demonstrations and representations related to Greenway's application for Prime Suite ePrescribing certification were false.

65.     In addition to RxNorm codes, Greenway also falsely represented Prime Suite's compliance with other certification requirements. Specifically, Greenway misrepresented that Prime Suite maintained and communicated patients' problem lists using SNOMED-CT codes so that other EHR systems would be able to read and incorporate important patient information. Prime Suite thereby was unable to satisfy in full all requirements related to Consolidated Clinical Documents (CCDA) at the time it was being tested for certification.

66.     In connection with transmitting SNOMED-CT codes for purposes of transmitting CCDA documents, a Greenway employee internally described the plan for passing testing as "not truely [sic] honest lol."

67.     Kornegay and Howerton reviewed the test scripts in advance of testing and worked off those documents in advising Greenway's computer programmers in connection with developing the Prime Suite software in a manner to pass certification testing without Prime Suite actually being able to meet all of the certification criteria, including use in full of the required vocabulary standards.

68.     After practicing the test scripts that its ACB had provided, Howerton and Kornegay recognized that Greenway's Prime Suite product was unlikely to pass and thus would not obtain certification.  After identifying Prime Suite's inability to meet the regulatory criteria, Kornegay and Howerton, with the assistance of a third party, manipulated Prime Suite's software coding to cover up the failings and to pass testing and obtain certification.

69.     On January 14, 2013, on the eve of testing, Howerton emailed his superiors, including Samples and Hardin, noting that because Greenway's "initial goal was to throw things as fast as possible together for certification, we need to really take time and make sure what we are planning to deliver is done the right way for our customers and their patient safety before pushing it out."  Despite this warning, Greenway did not ensure what it delivered was "done the right way for [Greenway] customers and their patient safety" before Prime Suite was released for use in the live patient treatment setting.

70.     Despite Samples' and Hardin's receipt of this communication, Greenway nonetheless went forward with CCHIT's testing of Prime Suite, which had been specifically coded to pass the test scripts but which otherwise failed to satisfy the full scope of the regulatory requirements.  Prime Suite thus passed certification testing when Greenway knew its product did not comply with the 2014 Edition certification regulatory criteria.  Greenway then released Prime Suite to its users knowing it did not comply with regulatory requirements.

71.     CCHIT tested and certified the Prime Suite product that Greenway presented in January 2013. Greenway knew this product did not fully meet all of the certification criteria either at the time CCHIT tested it or thereafter in the production version of the software used in thousands of providers' offices across the country.

72.     In January 2014, CCHIT discontinued serving as an ONC-ACB and Greenway retained the Drummond Group ("Drummond") to serve as its ACB for Prime Suite for the continued certification and associated requirements for continued post-market surveillance of Prime Suite.

73.     CCHIT's and Drummond's testing, surveillance, and certification efforts did not uncover that Prime Suite did not truly meet the full scope of the 2014 Edition certification requirements or that Greenway had rigged its Prime Suite software for purposes of passing certification testing.

74.     In light of Greenway's misrepresentations to its ACBs and its acts and/or omissions described above, Prime Suite did not qualify as certified EHR technology.

75.     Relying on Greenway's representations that its Prime Suite product was certified—which certification Greenway, as described above, had fraudulently induced—Greenway's users submitted to CMS and state Medicaid agencies thousands of Stage 2 claims and unknowingly falsely attested that they had satisfied the requirements of Meaningful Use by using certified EHR technology and were thereby eligible to receive Meaningful Use incentive payments.

**V.    GREENWAY INTENTIONALLY INFLATED USER ATTESTATION METRICS TO ENSURE USER RECEIPT OF INCENTIVE PAYMENTS TO WHICH THEY WERE NOT ENTITLED**

76.    In addition to fraudulently obtaining 2014 Edition certification for its Prime Suite product, Greenway also inflated certain Prime Suite users' Stage 1 Meaningful Use attestation metrics to ensure the users satisfied attestation thresholds and received incentive payments.

77.    For Stage 1 of the Meaningful Use program, eligible professionals had to satisfy "Core" objectives and associated measures and multiple "Menu" objectives and associated measures in order to obtain an incentive payment from CMS.  If an eligible professional failed to satisfy any "Core" measures, they were ineligible to receive an incentive payment.

78.    Core Measure 13 required that "clinical summaries [are] provided to patients for more than 50 percent of all office visits within 3 business days."  42 C.F.R. § 495.6(d)(13)(ii) ("the Clinical Summaries Measure").  A clinical summary is an after-visit summary that provides a patient with information relating to the visit such as updated vital signs, procedures performed and topics covered during the visit, an updated medication list, and a list of recommended tests. 75 FR 44358 (July 28, 2010).

79.    CMS included the requirement of providing clinical summaries as a core objective because "it is integral to involving patients and their families in their provision of care." 75 FR 44359 (July 28, 2010).  A clinical summary also assists patients ensure the information recorded in the EHR is correct, to recall the names of medications, and to communicate with family members as to their conditions and treatment.

80.    In order to satisfy the Clinical Summaries Measure—and thus to be eligible to receive Meaningful Use incentive payments—an eligible professional must show that it provided clinical summaries for more than half of all office visits within three business days.  In other

words, when the number of office visits for which a clinical summary was provided (the numerator) was compared to the total number of office visits conducted by the practice (the denominator), the resulting percentage must have been larger than 50 percent for the relevant reporting period. The following equation shows the Clinical Summaries Measure requirement, according to the published regulation:

$$\frac{\text{(Office visits with summaries provided)}}{\text{(Total office visits)}} > 50 \text{ percent}$$

*See* 42 C.F.R. § 495.6(d)(13)(ii); 75 FR at 81886 (Dec. 29, 2010).

81.    If an eligible professional fell short of the 50 percent requirement for the Clinical Summaries Measure, he or she would not be entitled to any Meaningful Use payment.

82.    Notwithstanding this requirement, Prime Suite went to market with a calculation for Clinical Summaries based on unique patient visits, not total patient visits. Greenway knew or should have known prior to releasing Prime Suite to users that its Clinical Summaries calculations were incorrect and could not be relied on to obtain a Meaningful Use payment.

83.    In summer 2011, Greenway determined that some of its users who had previously appeared to be on track to meet the Measure would in fact fail to meet the 50 percent threshold when they attested if the correct calculation was implemented. Greenway did not correct the faulty calculation and caused its users to attest with incorrect data.

84.    On or about December 19, 2011, a Greenway employee informed Kornegay by email of the error in the calculation of the Clinical Summaries Measure. In response, Kornegay sent an email to Greenway employees, including Howerton, stating, in part, that his "vote" was to not correct the calculation, and noting that Greenway "customer's [sic] clinical summary

19

numbers will be decimated if we make the change to visit level."

85.     On or about December 20, 2011, through an instant messaging program,

Kornegay sent a message to Howerton stating that he was preparing an email to ONC regarding

"clinical summaries changing randomly."

86.     The issue languished into 2012.  On or about April 4, 2012, Kornegay sent the

following messages to Howerton over the instant messaging program:

> KEVIN KORNEGAY: I think the fix is easy enough
> KEVIN KORNEGAY: the measure doesn't need to be changed, just the roll up
> KEVIN KORNEGAY: but where it gets messy is that we need to relay to our customers
> KEVIN KORNEGAY: and they will not be happy

87.     On or about July 9, 2012, Howerton sent an email to Kornegay, Hardin, and Tice

reporting on an analysis performed by another Greenway employee showing that if the change

were made to the Clinical Summaries Measure, "827 providers went from above 50% (passing)

to below 50% (failing)."  Howerton also raised the question as to whether Greenway should

correct its false data.

88.     On or about July 11, 2012, Kornegay emailed Howerton and Tice: "I have much

trepidation about changing the way this measure calculates at this point in time.  There are 800+

physicians who fall out of compliance due to this change, and 1 (one) who moves into

compliance.  I want to be honest and transparent as possible, but I think this will create some real

problems. . . ."

89.     On or about July 13, 2012, Tice responded to Kornegay and Howerton stating, "I

think that is probably the best course of action given the impact of making this change."  On

information and belief, Tice was indicating that the "best course of action" was not to submit

accurate user attestation data so that users failing to qualify for incentive payments would

nonetheless receive federal funds.

90.     On or about July 13, 2012, Kornegay and Howerton had the following exchange over an instant messaging program:

KEVIN KORNEGAY:  when do we have to decide by for clinical v [visit] summary

JARED HOWERTON: like ow
JARED HOWERTON: now

KEVIN KORNEGAY:  is this how Truman felt when he was staring at the phone?

JARED HOWERTON: not possible according to [another Greenway employee]
JARED HOWERTON: which I don't understand really

KEVIN KORNEGAY:  yea that's what he told me this morning

JARED HOWERTON: but I do understand
JARED HOWERTON: a little bit
JARED HOWERTON: I am torn
JARED HOWERTON: I really want to fix it

KEVIN KORNEGAY:  I didn't sleep well last night thinking about it
KEVIN KORNEGAY:  me too
KEVIN KORNEGAY:  but I don't want to get fired

JARED HOWERTON: that settles it
JARED HOWERTON: you can't sleep, there is something wrong
JARED HOWERTON: but then after we make the change, we won't be able to sleep either . . . .
JARED HOWERTON: the good news is . . . . . it isn't like it affects health
JARED HOWERTON: it just affects $$$

KEVIN KORNEGAY:  no patients are jeopardized

JARED HOWERTON: right

KEVIN KORNEGAY:  just incentive money

91.     On or about July 13, 2012, Howerton wrote to Kornegay, Tice and Hardin stating: "I am really struggling with this one.  I really do want to fix it (I think we all want to) but the PR is not going to be good."

92.     On or about July 13, 2012, Tice emailed Kornegay, Howerton, Hardin and

another Greenway employee: "I am going to have to run this by [Vice President of Customer Support] as there will definitely be a PR fallout. I am leaning towards fixing it in MU2." Upon information and belief, "MU2" refers to Meaningful Use Stage 2.

93.     On or about July 13, 2012, Kornegay emailed Tice: "I just got out of V[enissa]'s office. She sounds sold on waiting for MU2. . . ." On or about July 13, 2012, Tice responded to Kornegay, "Thanks. I think I am in agreement. Do you have concerns about waiting or are you okay with it?"

94.     On July 16, 2012, Hardin emailed: "[n]ot making any changes until MU2 seems like the least liability."

95.     On or about September 29, 2012, Kornegay received an email from Howerton acknowledging that Greenway decided not to make a change because "[m]any customers who would have passed MU would have th[e]n failed MU if we made the change."

96.     On or about September 29, 2012, Kornegay emailed Howerton: "we decided to hold off until the 1st of Jan. 2013 to make a change because, according to queries [another Greenway employee] ran for us, it would push a large amount of our providers from compliant to non-compliant for the clinical summaries measure."

97.     Greenway thus knowingly and intentionally decided to continue to proceed for program year 2012 with incorrect data and cause its users to submit inaccurate data in connection with applications for federal Meaningful Use funds. Greenway supervisors and managers—including Hardin, Tice, and Howerton—thus knew of and caused Greenway users to submit inaccurate and fraudulent data to CMS for purposes of causing taxpayer funds to be improperly provided to Greenway customers.

98.     Greenway's goal in allowing its Prime Suite users to unknowingly utilize an

incorrect calculation methodology was to unlawfully provide these users with inflated data on the Clinical Summaries Measure, which would enable those users to obtain Meaningful Use program payments to which they were not entitled.

99.     Greenway released Prime Suite patch number 16.1SP3 on or about February 18, 2013 to correct the software's calculation of the Clinical Summaries Measure.  Some Greenway users did not receive the patch that would have corrected the calculations error until later in the year.  Consequently, those users thought they were meeting the measure throughout the course of the year; after the patch was implemented, however, certain users went from meeting the regulatory thresholds to failing to meet them.

100.    Greenway, knowing that this set of Prime Suite users would not pass the Clinical Summaries measure if they used a correct calculation, provided approximately fifty (50) users with their prior, incorrect calculations so that they could attest to meeting the Clinical Summaries Measure and obtain federal incentive payments.

101.    On or about November 27, 2013, in response to forwarded emails from a customer complaining that after upgrading to a new version of Greenway's software in the middle of 2013 its percentage on the Clinical Summaries Measure dropped below 50 percent, Tice emailed Kornegay, Howerton, and Hardin saying "[i]t was my understanding that a query of the old calculation could be provided for site's [sic] that ended up in this condition. . . . is that correct?"  On or about November 27, 2013, Kornegay responded to the group that "I don't think we have been doing that, but I don't see why we couldn't."

102.    On December 4, 2013, Tice wrote Kornegay about receiving "an irate call from Princeton and Rutgers today threatening to go to the Attorney General (give me a break).  I think we need to talk further about how to put the old calculation back for these sites that were in the

green before upgrading . . . ."  Kornegay responded that he was "not opposed to that" but acknowledged, "that there could be recourse because I think the auditors are looking at the denominator for that one."  Thus, Kornegay explicitly knew that CMS had an audit program to review Meaningful Use attestation data in general and as to the Clinical Summaries Measure in particular.

103.    Moreover, Kornegay in December emailed CMS (carbon copying Hardin, Tice and Howerton) concerning Greenway's use of an inaccurate calculation methodology.  CMS advised Kornegay that Greenway users could not use the faulty calculation in connection with submitting data for purposes of Meaningful Use payments.  Kornegay and Greenway were thus explicitly aware that not only was their data inaccurate, but that CMS performed post-payment audits to identify improper payments and that CMS did not authorize Greenway's use of a faulty calculation methodology.

104.    Kornegay and Greenway nonetheless again went forward with using the incorrect data.

105.    Indeed, on December 31, 2013, Tice sent an email to a Greenway customer support mailbox stating in part, "For customers that need the original calculation logic of once per patient per year, we can enable it for your attestation."

106.    On March 25, 2014, in response to an emailed question from Kornegay about how many sites had been given their "'original' numbers if they request it," Tice wrote to Kornegay, confirming, "Yes, we have been doing that for a while now.  I would say we have done at least 50 sites – maybe more."

107.    As before, Greenway's goal in enabling these Prime Suite users to utilize an incorrect calculation methodology was to unlawfully provide these users with inflated data on

the Clinical Summaries Measure, which in turn would result in these users obtaining Meaningful Use program payments to which they were not entitled.

108.    Consequently, Greenway caused Prime Suite users to submit inaccurate attestation information in connection with their requests for Stage 1 Meaningful Use incentive payments.

109.    Beyond the intentional inflation of users' Clinical Summaries measure, Greenway employees themselves questioned the reliability of Prime Suite attestation data. Prime Data Cloud was a system utilized by Prime Suite to record and track user attestation data and Greenway employees confirmed that it could not be relied upon to produce accurate user data.

110.    Shortly after certification testing, on January 15, 2013, Kornegay stated that "our dashboard in production is f'd up like a donkey eating fermented figs."

111.    On November 26, 2014, Kornegay opined on Greenway's efforts to use the Prime Data Cloud for purposes of producing user attestation data, noting "probably the biggest is the [Prime Data Cloud] debacle because it means that everyday necessitates being shifty and what I ultimately feel is dishonest. basically for a year i've been point man on what slithery options we have forced our users into."

112.    That same day Jared Howerton described the Prime Data Cloud as "a pack of garbage like scattered all down the street into the next state." Kornegay responded, "yes it's a mess." Kornegay went on to opine that the system does not work for users "with any integrity."

## VI.    GREENWAY'S PRIME SUITE REFERRAL PROGRAM PAYMENTS VIOLATE THE ANTI-KICKBACK STATUTE

113.    From January 1, 2011 through December 31, 2017 (hereinafter "the relevant time period"), Greenway paid unlawful remuneration to influential customers for purposes of increasing sales. Among other things, at various times during the relevant period, Greenway

made unlawful payments pursuant to "Ambassador Programs," "Reference Programs," and other referral programs, and provided gifts and other things of value in order to induce its users to recommend Greenway.

114.    Through its "Ambassador Programs," Greenway paid favored customers to host site visits, complete reference calls with prospective customers, and engage in other promotional activity.

115.    Greenway gave "Ambassadors" credits toward their annual fees, either as flat sum amounts, or as discounts equal to as much as 15 percent off software support fees.

116.    Greenway selected its Ambassador practices based in part on how positive that practice was likely to be in speaking about Greenway.  In particular, whether and how positively a user reviewed Greenway's products in industry surveys was weighed heavily by Greenway when determining whether a practice was suitable for its Ambassador Program.  Moreover, where Greenway discovered that a current Ambassador practice was not sufficiently positive about Greenway's products and services, that practice would be evaluated for removal from the Ambassador Program.

117.    Greenway further provided training and guidance to its Ambassadors about how best to promote its products and services, and failed to disclose to prospective customers that its Ambassadors were compensated by Greenway.

118.    One of the central goals of Greenway's Ambassador Program was to generate sales.  Greenway tracked the amount of money provided to Ambassadors and compared those amounts to the amount of sales generated as a result of those payments.  Greenway regularly evaluated its return on investment under the Ambassador program—both at the level of the individual Ambassador Practice, and the Ambassador Program as a whole.

119.    Greenway's "Reference Program" was similar in many respects to its Ambassador Program, but was available to a larger cross-section of Greenway's users.  Greenway users that were not already "Ambassadors" could request to participate in Greenway's Reference Program and likewise receive credits for hosting site visits and completing reference calls.

120.    Greenway based selection of its Reference Program participants at least in part on how positive that practice was in speaking about Greenway and considered whether to remove practices from the Reference Program when the practices were not sufficiently positive. Greenway also provided training to Reference Program participants about how best to promote its products and services.

121.    Greenway did not expect Reference Program participants to be candid about problems with Greenway's products or services but rather expected Reference Program participants to speak only positively about Greenway and its products.

122.    Reference Program participants received credits based upon the size of the prospective customer.  For example, in 2015, Reference Program practices would receive a $500 credit for hosting a prospective customer with a practice size of one to three providers, and a $1,500 credit for hosting a prospective customer with a practice size of four or more providers.

123.    Greenway paid Reference Program participants larger credits for hosting larger prospective practices because a larger practice would be required to purchase more licenses from Greenway.

124.    Moreover, Greenway paid Reference Program participants for the site visits and reference calls that resulted in a sale.

125.    In certain instances, Greenway sales personnel also notified prospective customers of the prospect of receiving Reference Program credits in the future, as part of an

effort to "close the sale" and convince prospective customers to purchase Greenway's products and services.

126.     Greenway additionally paid referral credits to current users who recommended prospective customers to Greenway. The size of the credit that Greenway paid for such referrals was directly tied to the size of the prospective client. For example, in 2014, Greenway paid $750 for the referral of a one or two physician group, and $2,000 for the referral of a group of three or more physicians. Moreover, Greenway only paid referral credits for referrals that actually resulted in a sale.

127.     Greenway also lavished gifts and other things of value on its most favored customers during the relevant time period, including providing iPads, meals, travel, tickets to sporting events and entertainment, all for the purpose of inducing these users to either continue using Greenway's products or recommend Greenway to other health care providers who would and did use federal healthcare program funds to purchase Greenway's products and services.

128.     In connection with just the referral and reference payments, Greenway doled out approximately $756,855.00 between 2011 and 2017 in connection with Prime Suite.

## COUNT I
## False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

129.     Through the conduct alleged above, Greenway knowingly caused healthcare providers who used its software to present false or fraudulent claims for federal incentive payments that were paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(A).

130.     The United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

28

## COUNT II
### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

131.    Through the conduct alleged above, Greenway knowingly made or used false records or statements material to false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(B).

132.    As a result of the false records or statements made by Greenway, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT III
### Unjust Enrichment

133.    The United States claims the recovery of all monies by which Greenway has been unjustly enriched, including profits earned by Greenway because of the unlawful conduct alleged above.

134.    Greenway was unjustly enriched, and is liable to account and pay such amounts, which are to be determined at trial, to the United States.

135.    By this claim, the United States requests a full accounting of all revenues and costs incurred by Greenway, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

### **PRAYER**

WHEREFORE, Plaintiff the United States of America prays for judgment against the Defendant as follows:

136.    On Counts I and II under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

137.    On Count III for unjust enrichment, for the damages sustained and/or amounts by

which Greenway retained illegally obtained monies, plus interest, costs, and expenses, and such

further relief as may be just and proper.

Dated:  February 6, 2019

JOSEPH H. HUNT
Assistant Attorney General

Respectfully submitted,

UNITED STATES OF AMERICA

CHRISTINA E. NOLAN
United States Attorney

By:

MICHAEL D. GRANSTON
EDWARD C. CROOKE
KELLEY HAUSER
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
(202) 514-6831
edward.crooke@usdoj.gov
kelley.hauser@usdoj.gov

NIKOLAS P. KEREST
OWEN C.J. FOSTER
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
nikolas.kerest@usdoj.gov
owen.c.j.foster@usdoj.gov

Attorneys for the United States

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

2:19-cv-20

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Greenway Health, LLC |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Owen C.J. Foster, AUSA
US Attorney's Office, District of Vermont
Box 570, Burlington, VT 05401 (802) 951-6725

Attorneys *(If Known)*
Adam P. Schwartz, Esq., Carlton Fields
4221 W. Boy Scout Blvd., Suite 100, Tampa, FL 33607-5780
(813) 223-7000

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
     Plaintiff

☐ 3  Federal Question
     *(U.S. Government Not a Party)*

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district *(specify)*   ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. §§ 3729-3733
Brief description of cause:
False Claims Act Violations

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
02/06/2019

SIGNATURE OF ATTORNEY OF RECORD
*Owen Foster*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE 1012  MAG. JUDGE _____